**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

IRENE CASTRO,                          :
     Plaintiff,                        :          CIVIL ACTION NO.
                             :          3:12-CV-01535 (VLB)
v.                                     :
                             :
JOYES NARCISSE and PATRICK COLLINS, :          May 14, 2015
     Defendants.                       :

**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Dkt. #24]**

**I.  Introduction**

     The Plaintiff, Irene Castro ("Castro"), brings this action against Defendants

Connecticut State Police Troopers Joyes Narcisse ("Narcisse") and Patrick Collins

("Collins" and, together with Narcisse, "Defendants") in their individual capacities

for false arrest, malicious prosecution and unreasonable search and seizure in

violation of the Fourth Amendment and pursuant to 42 U.S.C. § 1983, and for

conversion of property and intentional infliction of emotional distress under

Connecticut common law.  Defendants have moved for summary judgment in their

favor on all of Plaintiff's claims.  For the reasons that follow, Defendants' Motion for

Summary Judgment is GRANTED in part and DENIED in part, and judgment is

entered in favor of Defendants on all claims except the conversion claim.

**II.  Local Rule 56 Statements**

     As an initial matter, the Court notes that Plaintiff has failed to fully comply

with the Local Rules of Civil Procedure for contesting facts on a motion for

summary judgment.  A party filing a summary judgment motion must annex a

"concise statement of each material fact as to which the moving party contends

there is no genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)(1).  The party

opposing a motion for summary judgment must then file an answering document which states "whether each of the facts asserted by the moving party is admitted or denied" and must also include a "list of each issue of material fact as to which it is contended there is a genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)(2).  Each denial in a summary judgment opponent's Local Rule 56(a)(2) statement "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  D. Conn. L. Civ. R. 56(a)(3).  Where a party fails to appropriately deny material facts set forth in the moving party's 56(a)(1) statement, and where those facts are supported by evidence in the record, those facts are deemed to be admitted.  *See SEC v. Global Telecom Servs. L.L.C.*, 325 F. Supp. 2d 94, 109 (D. Conn. 2004); *Knight v. Hartford Police Dep't*, No. 3:04CV969(PCD), 2006 WL 1438649, at \*4 (D. Conn. May 22, 2006).  Here, Plaintiff has failed to adequately deny many of the facts that Defendants have proffered, either by failing to support her 56(a)(2) denials with citations to evidence in the record that contradicts Defendants' alleged facts, or by stating without citation that Plaintiff is "not in a position to admit or deny" certain statements.[1]  As to these matters, Plaintiff, who bears the burden of proving her claims, concedes that she has no evidence raising a question of fact for a jury to decide.

   III. Factual Background

       The following facts relevant to the Defendants' Motion for Summary Judgment are undisputed unless otherwise noted.

---

[1] In her 56(a) Statement, Plaintiff consistently "denied" Defendants' asserted facts without citation to evidence and sometimes also without supplemental facts to refute those facts.  [*See* Dkt. 32-1 at ¶¶ 4–6, 9, 13, 27, 35, 44, 50, 52, 54.]  In other instances, Plaintiff responded that she was "not in a position to admit or deny" Defendants' asserted facts.  [*See id.* at ¶¶ 3, 18.]

2

On August 3, 2011, Plaintiff Ms. Castro, a 78-year-old woman, stopped at the Mohegan Sun Casino (the "Casino") to gamble.  [Dkt. 24-1, Defendants' 56(a)(1) Statement at ¶ 1.]  Mrs. Wilta Paulo ("Mrs. Paulo"), a 40-year-old woman, was also at the Casino that day.  [*Id.* at ¶ 2.]  Through a sworn statement by Mrs. Paulo, Defendants contend that before arriving at the Casino, Mrs. Paulo stopped at a bank and withdrew one thousand dollars in the denominations of ten one hundred dollar bills, which she put in a bank envelope along with her Connecticut driver's license, a Mohegan Sun Casino player's card, and a $75.00 buffet coupon.  [*Id.* at ¶¶ 3–4 and Ex. 3, Witness Statement of Wilta Paulo.]  Plaintiff admits that Mrs. Paulo withdrew one thousand dollars from her bank at approximately 1:04 pm that day, but denies without citation to the record that the bank envelope contained any money, the driver's license, the player's card or the $75.00 food coupon.  [Dkt. 32-1, Plaintiff's 56(a)(2) Statement at ¶¶ 3–4.]

Mrs. Paulo testified that once at the Casino, she played blackjack with one hundred dollars of the money in the bank envelope, which she lost but subsequently won back and returned to the envelope.  [Dkt. 24-1 at ¶ 6.]  Plaintiff admits that Mrs. Paulo gambled but denies without citation to the record that Mrs. Paulo lost and then won back the hundred dollars, and points out that Defendant Narcisse testified that he did not know what Mrs. Paulo was doing during this time. [Dkt. 32-1 at ¶ 6.]

At or around 2:55 pm, Mrs. Paulo put the envelope under her shirt and walked towards the poker room.  [Dkt. 24-1 at ¶¶ 7–8.]  A Casino security camera captured Mrs. Paulo walking when, unbeknownst to her, the envelope dislodged and fell to the floor, where Mrs. Paulo left it behind as she continued on.  [*Id.* at ¶¶ 8, 10.]

3

Defendants and Plaintiff dispute whether the envelope fell as though it had weight and heft to it.  [*Id.* at ¶ 9; Dkt. 32-1 at ¶ 9.]  However, Defendant Narcisse, who reviewed the surveillance tape in the course of his investigation into the incident that day, testified that it appeared to him "that there was something in it because it appeared it fell with some weight . . . . So it didn't float to the floor . . ." [Dkt. 24, Ex. 6, Deposition of Joyes Narcisse, p. 28, lines 2–5.]

The Casino security camera then recorded Plaintiff Mrs. Castro walking approximately 10–15 seconds behind Mrs. Paulo.  [Dkt. 24-1 at ¶¶ 11–12.]  As can be seen in the security camera footage, Ms. Castro approached the envelope, stopped, and tapped it with her foot, then bent down to pick it up.  [*Id.* at ¶ 13.]  The parties agree that no one touched the envelope in the seconds between the time the surveillance video showed Mrs. Paulo dropping it and the time the video showed Mrs. Castro picking it up.  [*Id.* at ¶ 14.]

Defendants assert that Mrs. Castro picked up the envelope with her right hand and transferred it to her left hand, which was covered by her coat, in order to hide the envelope from view.  [*Id.* at ¶ 13.]  Specifically, Defendant Narcisse testified that when he watched the surveillance tape, "[i]t appeared to me that she was manipulating the envelope in a way to, you know, secrete it, to make it unvisible [*sic*]."  [Dkt. 32, Ex. 2, Deposition of Joyes Narcisse at p. 27, lines 17–19.]  Plaintiff disputes that this action was taken in an attempt to conceal.  [Dkt. 32-1 at ¶ 13.]

After Mrs. Castro picked up the envelope, she continued walking toward the poker room.  [Dkt. 24-1 at ¶ 15.]  She did not stop to talk to anyone, nor did she throw the envelope into any of the nearby trash receptacles.  [*Id.* at ¶ 16.]  When Mrs. Castro arrived in the poker room, she put her name on the list to play poker

4

and then walked towards a women's restroom.  [*Id.* at ¶ 17.]  A Casino security camera captured Mrs. Castro walking into this restroom approximately 70 seconds after the camera recorded her picking up the envelope.  [*Id.* at ¶¶ 13, 17.]  The security camera then captured Mrs. Castro as she exited the bathroom approximately three minutes later.  [*Id.* at ¶¶ 36–37; Ex. 4, Surveillance Video at 3:00:46.]

In the meantime, Mrs. Paulo testified that when she got to the poker room, she realized she was missing her envelope.  [Dkt. 24-1 at ¶ 18.]  She looked around and tried to locate it and then contacted Casino security.  [*Id.*]  The Casino security officers then contacted their surveillance unit and were able to locate the security camera footage described *supra*.  [*Id.* at ¶ 19.]  From this footage, Casino security located Mrs. Castro and asked her to accompany them to their security office, where Mrs. Castro waited while the Defendants responded to security's request for state trooper involvement.  [*Id.* at ¶ 20.]

When Defendants arrived in the Casino security office, the Casino security supervisor, Mr. Nelson, told Defendants that a person had lodged a complaint after dropping an envelope containing money and personal items, that surveillance had located the person who recovered the envelope, and that that person, Mrs. Castro, was in the security office.  [*Id.* at ¶¶ 21–22.]  Defendants then went to the security office, introduced themselves to Mrs. Castro as Connecticut State Police Troopers, and explained that there was a complaint of lost money in an envelope and that the casino had video footage of Mrs. Castro picking up that envelope.  [*Id.* at ¶ 23.]  Mrs. Castro told Defendants that as she was walking towards the poker room, she had seen an envelope on the floor, picked it up, and carried it with her to the poker room

5

where she put her name on a list before going into the women's restroom and throwing the envelope away there.  [*Id.* at ¶ 24.]  Mrs. Castro told Defendants that the envelope was empty.  [*Id.*]

After Defendant Narcisse spoke with Mrs. Castro, he left to interview Mrs. Paulo, who told him what she had told the Casino security officers and showed him a bank withdrawal receipt for $1000.00 that was dated August 3, 2011 and time-stamped 1:04 pm.  [*Id.* at ¶¶ 25–26.]  Mrs. Paulo also told Defendant Narcisse that she had been told by the poker room manager that her driver's license and player club card had been recovered from the trash in the women's bathroom.  [*Id.* at ¶ 27.]  Defendant Narcisse later noted this information in his investigation report.  [*Id.*, Ex. 2, Connecticut State Police Investigation Report dated August 8, 2011 at p. 3.]  Defendant Narcisse also took a sworn statement from Mrs. Paulo.  [Dkt. 24-1 at ¶ 28.]  Defendant did not otherwise attempt to verify the information Mrs. Paulo conveyed to him.  [Dkt. 32-1 at ¶ 27; Ex. 2 at pp. 39–40.]  Although it appears from the record that Mrs. Paulo's player club cards and driver's license were in fact recovered, it is unclear when and where in the sequence of events this occurred.  [Dkt. 24, Ex. 2 at p. 9.]

After speaking with Mrs. Paulo, Defendant Narcisse viewed the casino surveillance footage described *supra.*  [Dkt. 24-1 at ¶ 29.]  As already noted, Defendant Narcisse testified that his impression in viewing the footage was that when Mrs. Paulo dropped the envelope, it fell to the floor as though it had weight to it, and that it appeared that after Mrs. Castro retrieved the envelope, she hid it from view and continued on to the poker room without stopping to talk with anyone and without throwing the envelope into a nearby trash receptacle.  [*Id.* at ¶¶ 29–32.]

6

About 70 seconds later, Defendant Narcisse then observed Mrs. Castro coming back into view walking toward, and then into, the women's restroom.  [*Id.* at ¶ 34.]  At this point, Mrs. Castro still had her coat draped over her left arm and hand and the envelope was not visible, though she could only be seen from the back.  [*Id.*]  The parties dispute what, if anything, Mrs. Castro did once she entered the restroom and disappeared from view.  [*Id.* at ¶¶ 35–37; Dkt. 32-1 at ¶ 35.]  However, according to Defendant Narcisse's investigation report, when Mrs. Castro emerged from the bathroom around three minutes later, she no longer appeared to be holding the envelope.  [Dkt. 24, Ex. 2 at p. 3.]

Plaintiff does not dispute that Defendant Narcisse viewed the surveillance tape in the course of his investigation, or that he properly relied on the tape in the course of making his probable cause determination; Plaintiff merely disputes whether some of Defendant Narcisse's observations were reasonable.  [Dkt. 32-1 at ¶¶ 30–32.]  Specifically, Plaintiff maintains that "[t]here was no way from the video to see what, if anything from in the envelope [*sic*] . . . [or] whether the envelope 'fell with weight' as Defendants describe."  [*Id.*]  Plaintiff also contends that Mrs. Castro did not "transfer the envelope to her left hand, in which she also held a sweater and her purse . . . in attempt [*sic*] to hide the envelope from view."  [*Id.* at ¶ 13.]

After Defendant Narcisse had viewed the entire surveillance tape, he returned to the Casino security office and spoke to Mrs. Castro again.  [Dkt. 24-1 at ¶ 38.]  Both he and Defendant Collins asked her if the envelope she had picked up was really empty and if she was sure there was no money in it.  [*Id.* at ¶ 39.]  Mrs. Castro maintained her assertion that the envelope was empty.  [*Id.*]  Defendant Collins then asked Mrs. Castro how much money she had with her and she told them she only

7

had the money that was inside her wallet and showed him this money, which totaled $247.00. [*Id.* at ¶ 40.] Defendants asked her again if this was all the money that she had, and she assertively said that it was. [*Id.* at ¶ 41.] The Defendants both told her that if she had taken the money, she could still return it and not be in trouble, because the person who lost the money didn't want to press charges; she just wanted her money back. [*Id.*] Mrs. Castro once again said she did not have the money. [*Id.*]

At this point, it is undisputed that Defendants and Mrs. Castro relocated to the state police office within the Casino, and that once in that office, Mrs. Castro's pocketbook was searched and ten one hundred dollar bills were discovered in a zippered pocket. [*Id.* at ¶¶ 45–48.] However, there is a dispute as to when in the course of these events Mrs. Castro was told she was under arrest. According to Defendants, Defendant Narcisse told Mrs. Castro while they were still in the Casino security office that they were taking her to the state police office because she was under arrest for fifth degree larceny, a B misdemeanor pursuant to CGS § 53a-125a, and Defendants then escorted her to the state police office where her pocketbook was searched and her arrest was processed. [*Id.* at ¶¶ 42–43.] Plaintiff contends that she was not told that she was under arrest until after she had been taken to the state police office, her pocketbook was searched, and the money was discovered. [Dkt. 32-1 at ¶ 42; Dkt. 32, Ex. 1, Deposition of Irene Castro at p. 27, lines 21–23.] Specifically, according to Plaintiff, once in the state police office Defendants told her that they wanted her to empty her purse and that if she did not she would be arrested. [Dkt. 32-1 at ¶ 42.] Mrs. Castro initially refused and used her cell phone to try to get in touch with a family member, eventually reaching her elder son, Felipe

Castro, Jr., who spoke with Defendant Narcisse and insisted that Defendants did not have a right to search his mother's purse.  [*Id.*]  Defendant Narcisse again asserted that Mrs. Castro would be arrested if she did not empty her purse.  [*Id.*]  At that point, Mrs. Castro emptied her pocketbook and the thousand dollars were discovered.  [Dkt. 32, Ex. 1 at p. 22, lines 6–9.]  According to Plaintiff, it was only at this point that Defendant Narcisse told her she was under arrest.  [*Id.* at p. 27, lines 21–23.]

Regardless of when Mrs. Castro was told she was under arrest, however, Mrs. Castro admitted in her deposition that at the point that Defendants first began to question her—even before they brought her into the state police office, and certainly before her pocketbook was searched—she no longer felt as though she was free to leave or to decline to answer Defendants' questions.  [*Id.* at pp. 46–47, lines 25, 1–12.]  It is also undisputed that Mrs. Castro was placed under arrest that afternoon proximate to the time her pocketbook was searched.  The record reflects both an Arrest Report and a Notice of Rights issued on the afternoon of August 3, 2011, as well as a pair of booking photographs of Mrs. Castro.  [Dkt. 24, Ex. 2 at pp. 7–8, 17–18.]  Mrs. Castro also testified to being fingerprinted and photographed while in the state police office that afternoon.  [Dkt. 32, Ex. 1 at p. 28, lines 1–2.]

Upon discovering the money in Mrs. Castro's pocketbook, Defendant Narcisse told Mrs. Castro that the bills matched the missing money in both amount and denominations.  [Dkt. 24-1 at ¶ 49.]  Mrs. Castro once again stated that the money was hers, that she had forgotten that she had put it there, and that she had a bank receipt for it at her house.  [*Id.*]  Defendant Narcisse responded that since she had no one to bring the receipt to the Casino, she should bring it to court with her.

9

[*Id.* at ¶ 50.]  Defendant Narcisse then told Mrs. Castro that the one thousand dollars would be seized because he believed that it was Mrs. Paulo's missing money.  [*Id.* at ¶ 51.]

In his deposition, Defendant Narcisse testified that police protocol requires officers handling property seized in a search—such as the money recovered from Mrs. Castro's purse—to photograph it, inventory it, and then either retain it as evidence or release it to the person claiming ownership of it.  [Dkt. 32, Ex. 2 at p. 12, lines 14–25; p. 13, lines 1–18.]  According to Defendant Narcisse, whether or not the seized property can immediately be returned to a claimant is a case-by-case determination: "every case is handled individually . . . it's either the sergeant can make a clarification or the trooper determines if [the property is] going to be released [to the claimant]."  [*See id.* at p. 13, lines 16–24.]  Defendant Narcisse explained that for example, property can be returned directly to a claimant where it was merely lost and as a result there is no dispute as to its ownership, or where the property possesses some identifying characteristics that make it possible for an officer to prove that the claimant is in fact the owner of the property.  [*Id.* at p. 14, lines 9–20.]  Defendant Narcisse further testified that where there is a dispute as to the ownership of the property, the property is retained in state police custody as evidence and documentation of that evidence is filed with the court, which then becomes responsible for making the final determination of who the rightful owner is.  [*Id.* at p. 13, lines 3–15; *see also id.* at pp. 52–53.]

In the instant case, it is undisputed that Defendants Narcisse and Collins photocopied and inventoried the bills on state police form JD-CR-18, which Defendant Narcisse testified is the form used to itemize property when it is seized

without a search warrant.  [Dkt. 24, Exs. 10, 11; Dkt. 32, Ex. 2 at p. 55, lines 8–10.]
Defendant Narcisse also included the $1000.00 on Mrs. Castro's Personal Property
Inventory & Prisoner Processing Form, which Defendant Narcisse testified is used
to make an inventory of personal property when an arrestee is processed.  [Dkt. 24,
Ex. 9; Dkt. 32, Ex. 2 at p. 55, lines 12–13.]  It is also undisputed that after
inventorying and photocopying the ten one hundred dollar bills, Defendant Narcisse
gave the money to Mrs. Paulo.  [Dkt. 24-1 at ¶ 53.]  The Court notes that Mrs. Paulo's
signature appears in the middle section of Form JD-CR-18, along with a handwritten
note that reads "$1000.00 returned to owner."  [Dkt. 24, Ex. 11 at p. 1.][2]  Mrs. Paulo's
signature is also apparent on the back of Form JD-CR-18, acknowledging receipt of
the money and "relieving the above Police Department of responsibility for said
item(s)."  [*Id.* at p. 2.]

Defendant Narcisse testified that his reasoning in giving Mrs. Paulo the
money recovered from Mrs. Castro was that the ten one hundred dollar bills
discovered in Mrs. Castro's pocketbook matched the denominations and amount of
the money Mrs. Paulo had reported missing, and that Mrs. Castro had said nothing
about having this money in her pocketbook despite Defendants' repeated
questioning and Mrs. Castro's willingness to show them the money in her wallet.
[*Id.* at ¶ 52.]  However, Defendant Narcisse admitted in his deposition that there were

---

[2] In his deposition, Defendant Narcisse erroneously testified that the signature on
the line going through the middle section of the JD-CR-18 was that of his
supervisor, Sergeant Bohonowicz, and explained that Bohonowicz was required to
sign off on all his reports.  [Dkt. 32, Ex. 2 at p. 55, lines 14–25 and p. 56, lines 1–15.]
However, the signature in question clearly matches Mrs. Paulo's signature as it
appears on the reverse side of the JD-CR-18 and on her Witness Statement. [Dkt. 24,
Ex. 11 at p. 2; Ex. 3.]  It is unclear from the record whether Defendant Narcisse was
instead referring to one of the two signatures that appear on the bottom of the first
page of the JD-CR-18, below the typed text "Signed *(Police officer)*".  [Dkt. 24, Ex. 11
at p. 1.]

no identifying characteristics of the bills that would have conclusively established they were Mrs. Paulo's, and he conceded that at that point there was a dispute as to the bills' ownership.  [Dkt. 32, Ex. 2 at pp. 50–52.]   Defendant Narcisse nevertheless maintains that his actions in giving the money to Mrs. Paulo were proper given that Mrs. Castro had misled them through the entire investigation, and that at no point until the money was found did Mrs. Castro admit that she had it or that the money was hers.  [Dkt. 24-1 at ¶ 54.]  Plaintiff disputes this assertion and contends that Defendant Narcisse's actions violated proper police protocol in handling evidence and property when there is a dispute over seized property.  [Dkt. 32-1 at ¶ 54.]

According to Defendant Narcisse's investigation report, after Mrs. Castro was processed she was assigned a court date and a summons to appear in Norwich Superior Court and released on a $500.00 non-surety bond.  [Dkt. 24, Ex. 2 at p. 5.] At 6:30 pm, Mrs. Castro signed the Personal Property Inventory acknowledging that she had taken possession of her returned property.  [*Id.* at p. 13.]  She was subsequently escorted to the Casino security office where she was formally ejected from the Casino.  [Dkt. 24-1 at ¶ 56; Dkt. 24, Ex. 2 at p. 5.]

In October 2012, after the State of Connecticut allegedly entered a *nolle* in Plaintiff's criminal case, Plaintiff filed the instant action alleging that Defendants' actions towards her constituted false arrest, malicious prosecution, illegal search and conversion of her $1000.00.  [Dkt. 1, Complaint.]  She also alleged intentional infliction of emotional distress based on the fact that she "was deeply humiliated and distressed by her arrest, being forced to appear in court as an accused criminal, and being held out to the world as a thief."  [Dkt. 1 at ¶ 20].  Defendants filed a Motion to Dismiss, arguing that Mrs. Castro's arrest was supported by probable

cause and that the search they conducted was incident to Plaintiff's lawful arrest, that the Defendants were entitled to qualified immunity, and that the Plaintiff had failed to adequately state either an emotional distress claim or a claim for conversion.  [Dkt. 11.]  In September 2013, the Court denied Defendants' Motion to Dismiss and allowed the case to proceed.  [Dkt. 16.]

Defendants have now moved for summary judgment in their favor on all counts in the Plaintiff's Complaint on the ground that there is no genuine issue of material fact in dispute as to whether Defendants' actions were lawful.

IV. <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proof on a motion for summary judgment, and in order to meet its burden must prove that no material factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch-Rubin v. Sandals Corp.*, No. 3:03cv481(MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341(VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 726–27 (2d Cir. 2010).   Likewise, where a defendant presents evidence of a fact and the plaintiff admits she has no evidence to refute that fact, the plaintiff has failed to raise a genuine material issue for a jury to decide.  *See*, *e.g.*, *Odom v. Matteo*, 772 F. Supp. 2d 377, 398–99 (D. Conn. 2011).

V.  <u>Discussion</u>

A.  **False Arrest and Malicious Prosecution**

The dispositive question on summary judgment of Mrs. Castro's false arrest and malicious prosecution claims is whether there is any dispute in the material facts upon which Defendants relied in determining that probable cause existed for Mrs. Castro's arrest.  This is because "[t]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest,

**14**

whether that action is brought under state law or under § 1983." *Walczyk v. Rio*, 496 F.3d 139, 152 n.14 (2d Cir. 2007) (internal quotation marks and citation omitted).[3] Connecticut law places the burden on the false arrest plaintiff to prove the absence of probable cause. *See Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004) (citing *Beinhorn v. Saraceno*, 582 A.2d 208 (Conn. App. Ct. 1990)); *Vangemert v. Strunjo*, No. 3:08CV00700 (AWT), 2010 WL 1286850, at *4 (D. Conn. Mar. 29, 2010).  The existence of probable cause also constitutes a complete defense to a malicious prosecution claim.  *See, e.g., Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (quoting *McHale v. W.B.S. Corp.*, 446 A.2d 815 (Conn. 1982)).[4]

Probable cause to arrest exists where an officer has "knowledge or reasonable trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citations omitted); *see also Walczyk*, 496 F.3d at 156 ("[F]ederal and Connecticut law are identical in holding that probable cause to arrest exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.")

---

[3] Under Connecticut law, "[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." *Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir. 2007) (quoting *Outlaw v. City of Meriden*, 682 A.2d 1112 (Conn. App. Ct. 1996)).

[4] "To prevail on a malicious prosecution claim under Connecticut law, a plaintiff must prove the following elements: (1) the defendant initiated or continued criminal proceedings against the plaintiff; (2) the criminal proceeding terminated in favor of the plaintiff; (3) 'the defendant acted without probable cause;' and (4) 'the defendant acted with malice.'" *Babkiewicz*, 582 F.3d at 420 (quoting *McHale v. W.B.S. Corp.*, 446 A.2d 815 (Conn. 1982)).

(quoting *Weyant v. Okst*, 101 F. 3d 845, 852 (2d Cir. 1996) (internal quotation marks omitted)).  The Second Circuit has explained that "probable cause is a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules . . . . While probable cause requires more than a mere suspicion of wrongdoing, its focus is on probabilities, not hard certainties," and accordingly "[i]t requires only such facts as make wrongdoing or the discovery of evidence thereof probable."  *Walczyk*, 496 F.3d at 156–57 (internal quotation marks and citation omitted).  Likewise, "[b]ecause the existence of probable cause depends on the probability, rather than the certainty, that criminal activity has occurred, the validity of an arrest does not require an ultimate finding of guilt." *Johnson v. Ford*, 496 F. Supp. 2d 209, 213 (D. Conn. 2007).  Thus, for example, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest."  *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).

"Whether probable cause existed is a question that may be resolved as a matter of law on a motion for summary judgment if there is no dispute with regard to the pertinent events and knowledge of the officer."  *Weinstock v. Wilk,* 296 F. Supp. 2d 241, 256 (D. Conn. 2003) (citing *Weyant*, 101 F.3d at 852).  This is because "[p]robable cause is to be assessed on an objective basis."  *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007).  Thus, "[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citation omitted).  "In assessing probabilities, a judicial officer must look to the

factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Walczyk*, 496 F.3d at 156 (internal citations and quotation marks omitted).

Furthermore, even in the absence of actual probable cause a law enforcement officer is immune from liability if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met. *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 416 (2d Cir. 1999). The Second Circuit has consistently emphasized that:

> [i]n the context of probable-cause determinations, the applicable legal standard is clear, but there are limitless factual circumstances that officers must confront when applying that standard. Accordingly, there can frequently be a range of responses to given situations that competent officers may reasonably think are lawful. An officer is shielded from liability if there was arguable probable cause at the time of arrest—that is, if officers of reasonable competence could disagree on whether the probable cause test was met. The essential inquiry ... is whether it was objectively reasonable for the officer to conclude that probable cause existed.

*Benn v. Kissane*, 510 F. App'x 34, 38 (2d Cir. 2013) (internal quotation marks and citations omitted).

Defendants argue that summary judgment should be entered in their favor on Mrs. Castro's false arrest and malicious prosecution claims because the undisputed facts demonstrate that Defendants had probable cause to arrest Mrs. Castro for fifth degree larceny. [Dkt. 24-3, Defendants' Memorandum of Law in Support of Summary Judgment at pp. 5–12.] In the alternative, Defendants argue that Defendants are entitled to qualified immunity because the undisputed facts demonstrate that they reasonably believed probable cause existed for Mrs. Castro's

arrest. [*Id.* at pp. 23–25.] Plaintiff objects and contends that Mrs. Castro's arrest was unlawful because the information possessed by the Defendants, considered in its totality, did not amount to probable cause. [Dkt. 32, Plaintiff's Memorandum in Opposition to Summary Judgment at pp. 9–18.] Furthermore, Plaintiff contends that Defendants are not entitled to qualified immunity because they did not conduct a reasonable investigation before arresting Plaintiff. [*Id.* at pp. 29–30.] For the reasons that follow, the Court finds that based on the undisputed facts in the record, probable cause existed to arrest Mrs. Castro for larceny such that no reasonable fact finder could render judgment in favor of the Plaintiff on either her false arrest or malicious prosecution claim.

Under Connecticut law, a person may be guilty of larceny

> when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to: … (4) Acquiring property lost, mislaid or delivered by mistake. A person who comes into control of property of another that he knows to have been lost, mislaid, or delivered under a mistake as to the nature or amount of the property or the identity of the recipient is guilty of larceny if, with purpose to deprive the owner thereof, he fails to take reasonable measures to restore the property to a person entitled to it.

Conn. Gen. Stat. § 53a-119(4). A person is guilty of larceny in the fifth degree, which is a class B misdemeanor, "when he commits larceny as defined in section 53a-119 and the value of the property or service exceeds five hundred dollars." Conn. Gen. Stat. § 53a-125a. Pursuant to Conn. Gen. Stat. § 50-10, "[a]ny person who finds and takes possession of any article of the value of one dollar or more shall report the finding of such article to the police department of the municipality in which he finds

18

such article within forty-eight hours from the time of such finding" or be guilty of a class D misdemeanor.  Conn. Gen. Stat. § 50-10.

Plaintiff relies on this Conn. Gen. Stat. § 50-10 to argue that Mrs. Castro had a 48-hour grace period to return the money and that because that 48-hour window had not yet expired at the time Defendants arrested her, there was no probable cause to believe she had committed larceny and thus her arrest was unlawful.  [Dkt. 32 at pp. 15–18.]  Defendants contend that the 48-hour period referenced in Conn. Gen. Stat. § 50-10 was rendered moot when, upon questioning, Mrs. Castro repeatedly denied that she was in possession of the money.  [Dkt. 24-3 at p. 8.]  The Court agrees.  In essence, Plaintiff's argument is that Conn. Gen. Stat. § 50-10 should be read to mean that a person cannot form the requisite intent to deprive another of their property for the first 48 hours that that person retains the property.  This is patently beyond the plain meaning of § 50-10, and Plaintiff provides no support for such an interpretation of the statute.

Instead, Plaintiff argues without elaboration that Defendants' interpretation— that is, that Conn. Gen. Stat. § 50-10 becomes irrelevant where a suspect has demonstrated intent to retain the property of another—would render Conn. Gen. Stat. § 50-10 mere surplusage.  [Dkt. 32 at p. 17.]  Plaintiff's position is unpersuasive.  Section 50-10, which is entitled "Duties of Finder," merely establishes that any person who takes possession of another's property has an obligation to report its recovery to the police within 48 hours.  Conn. Gen. Stat. § 50-10.  This obligation is not rendered redundant by reading the definition of larceny to encompass situations in which, long before that 48-hour period has elapsed, a person has demonstrated the requisite specific intent to deprive or to

misappropriate that is "an essential element of larceny."  *State v. Fernandez,* 501 A.2d 1195, 1205 (Conn. 1985).  Nor does Section 50-10 work to negate Defendants' determination that when they questioned Mrs. Castro and encouraged her to return the money, her denials suggested a present intent to "deprive another of property or to appropriate the same to himself or a third person" by "wrongfully tak[ing], obtain[ing], *or withhold[ing]* such property from an owner."  Conn. Gen. Stat. § 53a-119 (emphasis added).  Connecticut courts have consistently acknowledged that a person's intent to deprive or misappropriate "is to be inferred from his conduct . . . and ordinarily can be proven only by circumstantial evidence"; accordingly, the person's conduct subsequent to taking possession of the property in question can be taken into consideration in determining that intent.  *See, e.g.*, *State v. Pulley*, 699 A.2d 1042, 1044 (Conn. App. Ct. 1997) (internal citations omitted).  Here, Defendants could have reasonably inferred that Plaintiff possessed the intent to withhold the money by her denial that she possessed it and then her insistence that it was hers.

Plaintiff also contends that Defendants did not sufficiently investigate Mrs. Paulo's allegations before arresting Mrs. Castro and thus failed to make an independent probable cause determination.  [Dkt. 32 at pp. 11–13.]  Specifically, Plaintiff argues that Defendants should have verified Mrs. Paulo's claim that the envelope contained $1000.00 despite the fact that she had already been gambling at the casino for two hours when she lost it.  [*Id.* at p. 13.]  Plaintiff also argues that Defendants should have taken steps to verify the recovery of Mrs. Paulo's driver's license and player's club card from the women's restroom, and that Defendant Narcisse impermissibly relied on Mrs. Paulo's "double hearsay" statement as to this fact.  [*Id.*]  However, Defendants correctly point out that "police officers, when

20

making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000). Moreover, a police officer is not required "to explore and eliminate every theoretically plausible claim of innocence before making an arrest," nor is a police officer required "to sit as prosecutor, judge, or jury" to determine whether a complainant's story will hold up at trial before he can make a probable cause determination. *Id.* at 635–36 (internal quotation marks and citations omitted). Here, Defendant Narcisse obtained a signed, sworn statement from Mrs. Paulo that was corroborated in substantial part by the Casino surveillance video, the bank receipt Mrs. Paulo produced showing her withdrawal of one thousand dollars a few hours earlier that day, and Mrs. Paulo's plausible explanation for why the envelope still contained one thousand dollars when she dropped it. Presented with this account, in conjunction with the other evidence available to them at the time of the arrest, Defendants had a reasonable basis for believing that there was probable cause to arrest Mrs. Castro, and they were not required to prove her version of the events wrong before doing so. *See, e.g., Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001).

Plaintiff also objects to Defendant Narcisse's interpretation of his observations from the surveillance video, and argues that Defendants lacked probable cause because Defendant Narcisse's conclusions about Mrs. Castro's behavior were unsupported by the circumstances. [Dkt. 32 at p. 14.] Specifically, Plaintiff conclusorily contends that Defendants' characterization of Mrs. Castro as "secreting" the envelope under her coat after she picked it up is "not reasonable" because "Plaintiff does not look around covertly to see if anyone saw her, and does

not immediately turn around to walk straight to the bathroom so that she can see what is in the envelope," and insists that Plaintiff's behavior is consistent with her intent to simply switch the envelope to her left side along with the rest of her belongings. [*Id.*] However, this argument is also unavailing. First, it is clear from the surveillance tape that reasonable law enforcement officers could disagree about whether Mrs. Castro was attempting to hide the envelope under her coat after picking it up and thus whether her actions justified a finding of probable cause. *See Posr*, 180 F.3d at 416. Accordingly, at minimum Defendants are qualifiedly immune from prosecution on that basis. Even more significantly, however, it is clear from the record that Defendants had ample other evidence upon which to base their probable cause determination, such that even if Defendant Narcisse's observation about Mrs. Castro's behavior in "secreting" the envelope was invalidated, it would not change the ultimate outcome here. The record demonstrates that at the time Mrs. Castro was taken into custody, Defendants had available to them the following facts, none of which are in dispute:

1) Mrs. Paulo's sworn statement that before arriving at the Casino, she had stopped at a bank and withdrawn one thousand dollars in the denominations of ten one hundred dollar bills, which she put in a bank envelope along with her Connecticut driver's license, a Mohegan Sun Casino player's card, and a $75.00 buffet coupon; that she had then gambled with $100 of that money, which she then recovered and returned to the envelope; that she subsequently dropped the envelope; and that she was told that the personal items in the envelope had been recovered in the women's restroom;

2) Mrs. Paulo's bank receipt demonstrating that she had withdrawn $1000.00 from the bank a few hours prior to losing the envelope; and

3) The surveillance footage showing Mrs. Paulo dropping the envelope and Mrs. Castro picking it up approximately 10-15 seconds later, heading into the women's restroom approximately 70 seconds after that, and then emerging without the envelope in hand.

These facts provide ample basis to warrant Defendants' belief that Mrs. Castro had committed or was in the process of committing a crime, and are therefore sufficient to establish probable cause for her larceny arrest.  Accordingly, Defendants' motion for summary judgment on Mrs. Castro's false arrest and malicious prosecution claims is GRANTED.

B.  Illegal Search

Defendants also contend that summary judgment is appropriate on Mrs. Castro's illegal search claim because the undisputed facts establish that Mrs. Castro's pocketbook was searched incident to a lawful arrest and in accordance with Connecticut state police inventory procedures.  [Dkt. 24-3 at pp. 12–15.]

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."  U.S. Const. amend. IV.  "The touchstone of the Fourth Amendment is reasonableness.  The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).  It is well established that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (citation omitted).

Two such exceptions to the warrant requirement are a search incident to lawful arrest and a search conducted to inventory personal property taken into police custody pursuant to a lawful arrest.  *Gant*, 556 U.S. at 338; *Colorado v. Bertine*, 479 U.S. 367, 371 (1987).  A search incident to lawful arrest "derives from

interests in officer safety and evidence preservation that are typically implicated in arrest situations" and may include only the arrestee's person and the area within his immediate control.  *Gant*, 556 U.S. at 339.  Of course, it is axiomatic that for a search incident to arrest to be lawful, probable cause must exist to justify the underlying arrest.  *See United States v. Robinson*, 414 U.S. 218, 235 (1973).  On the other hand, an "inventory search constitutes a well-defined exception to the warrant requirement" the justification for which "does not rest on probable cause."  *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983).  "Inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger[.]"  *Florida v. Wells*, 495 U.S. 1, 4 (1990).  An inventory search must be conducted pursuant to "standardized procedures," *United States v. Lopez*, 547 F.3d 364, 370 (2d Cir. 2008) (citing Supreme Court precedent), the existence of which "may be proven by reference to either written rules and regulations . . . or testimony regarding standard practices."  *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994).

Here, Plaintiff argues that Defendants' warrantless search of Mrs. Castro's pocketbook was not constitutional as either a search incident to arrest or an inventory search because, for the reasons reviewed above, Mrs. Castro's underlying arrest was unlawful.  [Dkt. 32 at pp. 18–20.]  Plaintiff also highlights the dispute in the record as to when Plaintiff was placed under arrest, arguing that because Plaintiff asserts she was not arrested until *after* Defendant Narcisse searched her bag, a dispute of fact exists that works to preclude summary judgment on her illegal search claim.  [*Id.* at pp. 18–19.]  However, Plaintiff's argument fails for two reasons.

24

First, regardless of when Mrs. Castro was told she was under arrest, the record demonstrates that she was in police custody before her bag was searched. "The test for custody is an objective one: whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." *United States v. Newton*, 369 F.3d 659, 671 (2d Cir. 2004) (quoting *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995) (internal quotation marks omitted)).  An arrest is marked by "either physical force . . . or, where that is absent, submission [of the suspect] to the assertion of authority." *United States v. Jones*, No. 3:13-CR-2 MPS, 2014 WL 1154480, at *8 (D. Conn. Mar. 21, 2014) (quoting *California v. Hodari D.*, 499 U.S. 621, 624 (1991)).  "An arrest need not be formal; it may occur even if the formal words of arrest have not been spoken provided that the subject is restrained and his freedom of movement is restricted." *Id.* (quoting *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991)).  In determining whether an individual has been "arrested" for purposes of the Fourth Amendment, courts consider, *inter alia*, the extent to which the individual's freedom of movement was restrained, the duration of the stop, and the physical treatment of the suspect.  *Oliveira v. Mayer*, 23 F.3d 642, 645 (2d Cir. 1994). A district court may decide the issue of whether an arrest has been made where "there can be but one conclusion as to the verdict that reasonable jurors could have reached." *Id.*

Here, the record indicates that Mrs. Castro was under arrest at the time her pocketbook was searched.  In her deposition, Mrs. Castro admitted that as early as when Defendants first began to question her in the Casino security office, she no longer felt as though she was free to leave or to decline to answer Defendants'

questions.  She was then moved from the Casino security office to the state police office, where she remained until she was escorted from the office and ejected from the Casino.  The record also indicates that either a member of Casino security or one of the Defendants was with her the entire time that she was detained, and that the total time of her detention, first in the Casino security office and later in the state troopers' office, spanned at least two hours, and in any event far longer than what could reasonably be considered a brief investigatory stop.  Because, as discussed *supra*, the Court finds that there was probable cause for Mrs. Castro's arrest by this point, Defendants' subsequent search of Mrs. Castro's pocketbook was permissible as a search incident to that arrest.

However, even assuming Plaintiff's version of the facts—that she was not arrested until right after her pocketbook was searched—Defendants are correct that the order in which they proceeded is not important so long as probable cause to arrest existed before the search was executed.  It is well established that the search incident to arrest exception to the warrant requirement permits an officer to conduct a full search of an arrestee's person before he is placed under lawful custodial arrest as long as "the formal arrest follow[s] quickly on the heels of the challenged search of [his] person" and the fruits of that search are not necessary to sustain probable cause to arrest him.  *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980).  This is because "the constitutional linchpin in a search incident to arrest is the probable cause to arrest, not an intention or announcement of formal arrest."  *Evans v. Solomon*, 681 F. Supp. 2d 233, 251 (E.D.N.Y. 2010).  For the same reasons already cited, Defendants possessed probable cause to arrest Plaintiff before the $1000.00 were discovered in her pocketbook.  Accordingly, the search of Plaintiff's

pocketbook was lawful regardless of whether her formal arrest occurred before that search, as claimed by Defendants, or after, as claimed by Plaintiff.[5]  Because the dispute over when Mrs. Castro was arrested is immaterial, summary judgment is GRANTED in Defendants' favor.

C.  Conversion

Defendants assert three grounds in support of summary judgment on Mrs. Castro's conversion claim.  First, they argue that because Defendants' actions were lawful, Plaintiff's federal claims fail and therefore the conversion claim, which is a state common law claim, should be dismissed.  For the same reason, Defendants also argue that the Court should decline to exercise jurisdiction over the state claims.  Finally, Defendants argue that their decision to turn the money over to Mrs. Paulo was reasonable under the circumstances.  [Dkt. 24-3, pp. 15–17.]  In opposition, Plaintiff contends that the record before the Court establishes that Defendants failed to follow proper protocol in handling the $1000.00 they seized from Mrs. Castro, and that Plaintiff has produced sufficient evidence to establish ownership of the money.  [Dkt. 32 at pp. 20–24.]

Under 28 U.S.C. § 1367, a district court has the discretion to exercise supplemental jurisdiction over pendent state law claims.  *See* 28 U.S.C. § 1367(a).  Although "[t]he court need not exercise supplemental jurisdiction in every case   . . . [t]he federal court should exercise supplemental jurisdiction and hear a state claim when doing so would promote judicial economy, convenience and fairness to the litigants."  *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 165–66 (D. Conn. 2005)

---

[5] **Because the Court finds that Defendants' search was lawful pursuant to the warrant exception for searches incident to arrest, the Court does not reach the question of whether the search was also lawful as an inventory search.**

(citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 715–26 (1966)).  Typically, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). However, pendent jurisdiction is "a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values," and the Court has discretion to retain jurisdiction over a remaining state law claim even when federal claims are dismissed before trial. *Id.* at 350.  Here, because Plaintiff's case was filed nearly three years ago and remanding or dismissing her state law claim would inevitably further prolong this litigation, the Court finds that it is in the interest of judicial economy and fairness to retain jurisdiction and consider the Defendants' motion for summary judgment of that claim here.

Under Connecticut law, "[c]onversion is defined as 'an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights.'" *Aviles v. Wayside Auto Body, Inc.*, No. 3:12-CV-01520-VLB, 2014 WL 4932993 (D. Conn. Sept. 30, 2014) (quoting *Clark v. Auto Recovery Bureau*, 889 F.Supp. 543, 548 (D. Conn. 1994)).  "A claim of conversion requires a plaintiff to establish four elements: (1) the items defendant took belonged to plaintiff, (2) defendant deprived plaintiff of the items for an indefinite period of time, (3) defendant's conduct was not authorized, and (4) defendant's conduct harmed plaintiff." *Id.* (internal quotation marks, citations and brackets omitted).

Defendants appear to base their motion for summary judgment on Plaintiff's inability to establish the third element of her claim.  To wit, they argue that Defendants' decision to give Mrs. Paulo the $1000.00 discovered in Mrs. Castro's purse was authorized by a state police protocol that, according to Defendants, permits troopers to make case-by-case determinations of whether seized or recovered property should be retained as evidence or released to the person claiming ownership of it.  Defendants contend that given the circumstances of the money's discovery, Defendant Narcisse's decision to give it to Mrs. Paulo was reasonable and thus within the scope of his discretionary authority.  [Dkt. 24-3 at pp. 16–17.]  In opposition, Plaintiff maintains that Defendants went beyond the scope of their authority in determining that the money belonged to Mrs. Paulo, and that as a result they wrongfully deprived Mrs. Castro of said money.  [Dkt. 32 at pp. 22–24.]

The only evidence Defendants offer of the Connecticut State Trooper protocol upon which they rely is through the testimony of Defendant Narcisse.  Defendant Narcisse's testimony, regarding *his* interpretation of the protocol as *he* understands it, is ultimately self-serving and thus insufficient to warrant a grant of summary judgment.  Moreover, the record suggests that Defendant Narcisse did not act appropriately even according to his own understanding of the protocol: after the ten one hundred dollar bills were discovered, Mrs. Castro consistently contended that the money was hers and claimed that she had a bank receipt for the bills at her home.  Defendant Narcisse went as far as to acknowledge that she should produce the receipt in court, suggesting his understanding that the ownership of the money remained in dispute; indeed, he explicitly admitted this in his deposition.  He also admitted that there were no identifying characteristics that would have enabled him

to definitively determine the ten one hundred dollar bills were Mrs. Paulo's.  This evidence suggests that Defendants were not authorized to release the money to Mrs. Paulo and could reasonably support a jury's verdict in favor of Plaintiff on her conversion claim.

The Court notes that Plaintiff in her opposition brief appears to suggest that the record establishes the $1000.00 in Mrs. Castro's pocketbook were in fact Mrs. Castro's.  [Dkt. 32 at p. 24.]  Effectively, Plaintiff's position appears to be that summary judgment can be granted in *her* favor on this claim.  The Court does not find that Plaintiff has put forth sufficient evidence to conclusively establish ownership over the money, nor has she made the proper procedural motion in support of this claim.  Nevertheless, because material issues of fact regarding the discretionary scope and proper application of Defendants' protocol for handling seized property remain undeveloped, and the ownership of the funds remain in dispute, material issues of fact germane to Plaintiff's conversion claim exist such that Defendants' motion for summary judgment on Plaintiff's conversion claim is DENIED.

D.  Intentional Infliction of Emotional Distress

Finally, Defendants move for summary judgment in their favor on Plaintiff's claim for intentional infliction of emotional distress, arguing that Plaintiff has failed to put forward any evidence from which a jury could infer that Defendants' conduct or Plaintiff's distress satisfies the elements of an intentional emotional distress claim.  [Dkt. 24-3 at 17–21.]  To prevail on a claim of intentional infliction of emotional distress, a plaintiff must demonstrate "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress

was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Watts v. Chittenden*, 22 A.3d 1214, 1221 (Conn. 2011) (quoting *Appleton v. Bd. of Ed.*, 757 A.2d 1059 (Conn. 2000)).  "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine . . . . Only where reasonable minds disagree does it become an issue for the jury." *Perez-Dickson v. City of Bridgeport*, 43 A.3d 69, 101 (Conn. 2012); *see also Cassotto v. Aeschliman*, 22 A.3d 697, 700 (Conn. App. Ct. 2011) (same); *Winter v. Northrup*, 334 F. App'x 344, 347 (2d Cir. 2009) (same).

Here, Plaintiff maintains that she has adequately identified "facts" giving rise to evidence of Defendants' "extreme and outrageous" conduct, namely, Defendants' failure to conduct an adequate investigation before arresting Plaintiff, and Defendants' actions to permanently deprive Plaintiff of her property without due process.  [Dkt. 32 at pp. 24–28.]  These assertions, without more, are merely conclusory descriptions of the false arrest, malicious prosecution, unlawful search and conversion claims that have already been addressed by this Court.  Where an intentional infliction of emotional distress claim is based on a plaintiff's arrest, and probable cause exists for that arrest, an intentional infliction of emotional distress claim may not stand: "enforcement of the law can hardly be called conduct beyond the acceptable bounds of decent society.  Subjecting a government official or employee to litigation for infliction of emotional distress arising from a valid arrest would be contrary to public policy and inhibit the enforcement of the law."  *Brooks v. Sweeney*, CV 06 5005224S, 2008 WL 5481203 (Conn. Super. Ct. Nov. 28, 2008),

*aff'd*, 9 A.3d 347 (Conn. 2010) (emotional distress claim failed where arrest warrant issued upon probable cause).  *See also Winter v. Northrop*, CIVA 306-CV-216 PCD, 2008 WL 410428 (D. Conn. Feb. 12, 2008), *aff'd sub nom. Winter v. Northrup*, 334 F. App'x 344 (2d Cir. 2009) (emotional distress claim failed where probable cause existed for plaintiff's arrest).  Nor does Plaintiff's surviving conversion claim salvage her emotional distress claim, because the disposition of the money could not have appreciably contributed to Plaintiff's distress: regardless of whether the bills had been given to the claimant or retained as evidence, Plaintiff would have lost possession of the money.  Finally, Plaintiff does not offer any evidence—and indeed does not even address the element in her opposition brief—that she suffered any distress as a result of Defendants' actions, let alone distress of the type and severity sufficient to allow a rational fact finder to render a verdict in her favor. Defendants' Motion for Summary Judgment on this claim is therefore also GRANTED.

## VI.   Conclusion

        For the reasons above, the Court DENIES Defendants' Motion for Summary Judgment on Plaintiff's claim for conversion.  The case will proceed to trial on this claim only.  Defendants' Motion for Summary Judgment is GRANTED and judgment is entered in favor of Defendants as to all of Plaintiff's remaining claims.

                          IT IS SO ORDERED.


                    _____/s/_____
                    Hon. Vanessa L. Bryant
                    United States District Judge

Dated at Hartford, Connecticut: May 14, 2015